UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                    :

RDPA, LLC,                             :

               Plaintiff,        :

                                :        20-cv-3573 (LJL)

        -v-                  :

                                :       OPINION AND ORDER

GEOPATH, INC.,                  :

                                :

              Defendant.     :

                                :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__6/15/2021__

LEWIS J. LIMAN, United States District Judge:

      Defendant Geopath, Inc. ("Geopath") moves, pursuant to Federal Rule of Civil Procedure

12(b)(6), to dismiss the complaint of Plaintiff RDPA, LLC ("RDPA") for failure to state a claim.

For the following reasons, the motion is granted.

## BACKGROUND

      RDPA is a Seattle, Washington based limited liability corporation.  Dkt. No. 1 (the

"Complaint") ¶ 2.  Geopath is a corporation headquartered and incorporated in the state of New

York.  *Id*. ¶ 3.

**I.**

### The Patents

      RDPA is the sole owner of all rights, title, and interest in and to five patents relevant to

this case (collectively the "Asserted Patents").[1]  All five Asserted Patents were addressed to

solving a challenge faced by businesses that advertise their goods or services through public

media displays: how to measure the public's exposure to public media displays, such as

billboards, in order better to understand the reach of such displays.  *Id*. ¶ 35.  The population that

---

[1] All five patents are related as continuations and divisionals of each other, and as such disclose
the same subject matter and have substantially the same specification.

1

is exposed to such displays—whether on billboards on the sides of highways or on kiosks in bus depots or other internal locations—is inherently transient and may have limited recall.  Indeed, "[a]s many media providers are well aware, some media displays can convey a message, and change a respondent's behavior, without the respondent actively recalling that they were exposed to the media display."  Dkt. No. 1, Ex. A at 26.  It may be difficult to reconstruct the demographics of every person who passes by a public media display.  *Id.*

The absence of readily-available data tracking exposure and reaction to public media displays presents challenges both to those who offer such displays and to those who employ them.  "[P]ublicly viewable media display providers could not take advantage of media-buying changes and thereby increase market share against other measured media . . . In fact, many media display providers did not even consider publicly displayed media as there was no reliable measurement system to gauge exposure."  *Id.*  Thus, "it would be an advantage to provide accurate measurements of exposure to public media displays in order to obtain exposure, reach and frequency statistics that can justify the value of such media displays."  *Id.*

Previous methods for tracking exposure to media displays had limitations.  One method involved installing radio devices in vehicles that respond to radios on media displays.  *Id.*  This method required that radios be installed on every media display to be surveyed.  *Id.*  "Leaving a radio off a particular media display would mean that media display has no chance of being assessed."  *Id.*  Another method was the use of consumer surveys, which are limited by the fact that respondents rarely remember all the media displays they have been exposed to.  *Id.*  Finally, other methods had employed vehicle tracking, which, though "marginally effective," were of limited value because "[o]ver an extended period of time many vehicles will have different occupants having different demographics," and because "under ordinary circumstances, vehicles

are not allowed in" areas designated for pedestrians.  *Id.*

The Asserted Patents, individually and as a group, disclosed a system and method for using monitoring devices in order to assess the exposure of media displays.  Dkt. No. 1 ¶ 37. Concepts disclosed in the Asserted Patents included "allowing satellite positioning system (e.g., GPS) enabled monitoring devices to track the movement of multiple respondents and a post processing server to rate the effectiveness of the media display using the geo location data from the monitoring devices."  *Id.* ¶ 38.

### A.    The '131 Patent

On November 29, 2005, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent Number 6,970,131 (the "'131 Patent"), entitled "Satellite Positioning System Enabled Media Measurement System and Method."  *Id.* ¶ 9.  The '131 Patent issued from U.S. patent application Serial Number 10/686,872 filed on October 16, 2003.  The '131 Patent was directed toward "utilizing monitoring devices for determining the effectiveness of various locations" for public media displays.  Dkt. No. 1, Ex. A at 26.  The '131 Patent proposed the use of satellite and radio frequency location tracking systems, such as GPS, to determine to which media displays respondents were exposed.  *Id.*  This information could then be used to determine the effectiveness of the media display based upon reach and frequency.  *Id.*

Claim 1 of the '131 patent, recites as follows:

A computer-implemented method of determining the effectiveness of media displays, the method comprising:
(a)  Storing geo data in a plurality of respondent monitoring devices as said plurality of respondent monitoring devices move along respective path of travel, at least a portion of said geo data derives from a satellite positioning system ("SPS"), said stored geo data representing the movement of said plurality of respondent monitoring devices along said respective paths of travel; and
(b)  downloading said geo data stored in said plurality of respondent monitoring devices to a post processing server for:

> (i)     matching the locations of a plurality of media displays to positions on said respective paths of travel of said plurality of respondent monitoring devices represented by said geo data; and
>
> (ii)    rating the effectiveness of said plurality of media displays based on said matches between said plurality of media display locations and said positions on said respective paths of travel of said plurality of respondent monitoring devices represented by said geo data.

Dkt. No. 1, Ex. A at 38.  In essence, it claims as a method the use of GPS technology generally to capture location data from devices as they travel along a designated path and pass public media displays and then to use the data captured by the GPS technology to rate the effectiveness of the media displays.

Claim 3 of the '131 Patent recites as follows: "The method of claim 1, wherein rating the effectiveness of said media displays comprises determining the reach and frequency of said media displays." *Id.*

Claim 7 of the '131 Patent recites as follows: "The method of claim 1 wherein said geo data is grouped in accordance with the demographics of said respondents." *Id.*

**B.     The '619 Patent**

On May 2, 2006, the USPTO issued U.S. Patent Number 7,038,619 (the "'619 Patent") entitled "Satellite Positioning System Enabled Media Measurement System and Method." *Id.* ¶ 13.  The '619 Patent issued from U.S. patent application Serial Number 10/318,422 filed on December 11, 2002 and discloses and relates to assessing the effectiveness of media displays. *Id.* ¶ 14.  Like the '131 Patent, the '619 Patent was directed toward a method for tracking individuals and their exposure to media displays by using a satellite positioning system.  Dkt. No. 1, Ex. B at 26.

Claim 1 of the '619 Patent states:

> A method for determining the effectiveness of media displays, comprising: employing a plurality of monitoring devices for determining the paths of travel

4

followed by a plurality of respondents, each of said respondents associated with a respective one of said plurality of monitoring devices each of said plurality of monitoring devices utilizing a satellite positioning system ("SPS") to independently track the movement of the related respondent along the path of travel followed by the respondent, each of said plurality of monitoring devices generating geo data that represents the path of travel followed by the respondent;
storing said tracking as geo data;
collecting the geo data from each of the monitoring devices; and
analyzing said collected geo data to determine if said plurality of respondents have been exposed to media displays by matching said geo data that represents the paths of travel followed by said plurality of respondents with media display locations to determine the effectiveness of the media displays at the media display locations.

*Id.* at 38.

Claim 9 of the '619 Patent recites: "The method of claim 1, wherein said plurality of respondents are categorized according to demographic characteristics." *Id*.

Claim 13 of the '619 Patent recites: "The method of claim 1, where in the geo data that represents that path of travel followed by a respondent is stored in the monitoring device associated with the respondent." *Id*.

Claim 14 of the '619 Patent recites: "The method of claim 13, wherein the geo data stored in the monitoring devices is collected by downloading the geo data to a computing device." *Id*.

Claim 15 of the '619 Patent recites: "The method of claim 14, where in the computing device analyzes the geo data to determine if said plurality of respondents have been exposed to media displays by matching said geo data that represents the paths of travel followed by said plurality of respondents with geo data that represents the locations of the media displays to thereby determine the effectiveness of said media displays." *Id*.

C.     **The '834 Patent**

On February 13, 2007, the USPTO issued U.S. Patent Number 7,176,834 (the "'834 Patent"), entitled "Satellite Positioning System Enabled Media Measurement System and

Method." *Id.* ¶ 17.  The '834 Patent issued from U.S. patent application Serial Number

11/366,349 filed on March 2, 2006 and discloses and relates to assessing the effectiveness of

media displays. *Id.* ¶ 18.  The '834 Patent, like the '131 Patent and the '619 Patent before it, was

directed toward the use of locations tracking technology to assess exposure to public media

displays.  Dkt. No. 1, Ex. C at 26.

> Claim 1 of the '834 Patent states:
>
> A method for determining the effectiveness of media displays, comprising:
> employing a plurality of monitoring devices for tracking the paths of travel
> followed by a plurality of respondents, each of said respondents associated with a
> respective one of said plurality of monitoring devices, each of said plurality of
> monitoring devices utilizing a satellite positioning system ("SPS") to independently
> track the movement of the related respondent along the path of travel followed by
> the respondent, each of said plurality of monitoring devices generating satellite data
> that represents the path of travel followed by the respondent;
> storing said satellite data;
> collecting the satellite data from each of the monitoring devices; and
> analyzing said collected satellite data to determine if said plurality of respondents
> have been exposed to media displays by matching geo data based at least in part on
> said satellite data that represents the paths of travel followed by said plurality of
> respondents with media display locations to determine the effectiveness of the
> media displays at the media display locations.

*Id.* at 38.

Claim 8 of the '834 Patent states: "The method of claim 1, wherein said plurality of

respondents are categorized according to demographic characteristics. *Id.*

Claim 12 of the '834 Patent states: "The method of claim 1, wherein the satellite data that

represents that path of travel followed by a respondent is stored in the monitoring device

associated with the respondent." *Id.*

**D.    The '280 Patent**

On May 8, 2007, the USPTO issued U.S. Patent Number 7,215,280 (the "'280 Patent"),

entitled "Satellite Positioning System Enable Media Exposure." *Id.* ¶ 21.  The '280 Patent issued

from U.S. patent application Serial Number 11/489,029 filed on July 18, 2006 and discloses and

relates to assessing the effectiveness of media displays. *Id.* ¶ 22. In addition to claiming a method for using location tracking to evaluate media displays, the '280 Patent additionally claimed the use of a data processing system to track respondents' paths of travel, to collect respondents' satellite data, and to analyze the data. Dkt. No. 1, Ex. B at 26, 38.

Claim 1 of the '280 Patent states:

Computer-readable media having stored thereon data representing the exposure of media displays to respondents ("media display exposure data"), said media display exposure data created by:
(a) tracking paths of travel followed by a plurality of respondents utilizing a satellite positioning system ("SPS") to:
    (i) independently track the movement of each of the respondents along the path of travel followed by the respondent; and
    (ii) generate satellite data that represents the path of travel followed by the respondent ("respondent satellite data");
(b) collecting the respondent satellite data; and
(c) analyzing said collected respondent satellite data to determine if said respondents have been exposed to media displays by matching geo data based at least in part on said respondent satellite data with media display location data.

Dkt. No. 1, Ex. D at 39.

Claim 15 of the '280 Patent states:

A data processing system, comprising:
(a) a data processor; and
(b) data storage coupled to the data processor, the data storage storing, in a form suitable for processing by the data processor, data representing the exposure of media displays to respondents ("media display exposure data"), said media display exposure data created by:
    (1) tracking paths of travel followed by a plurality of respondents utilizing a satellite positioning system ("SPS") to:
        (i) independently track the movement of each of the respondents along the path of travel followed by the respondent; and
        (ii) generate satellite data that represents the path of travel followed by the respondent ("respondent satellite data");
    (2) collecting the respondent satellite data; and
    (3) analyzing said collected respondent satellite data to determine if said respondents have been exposed to media displays by matching geo data

> based at least in part on said respondent satellite data with media display location data.

*Id*. at 38.

Claim 16 of the '280 Patent states: "The data processing system claimed in claim 15, wherein the media display exposure data includes respondent demographic data." *Id*.

Claim 17 of the '280 Patent states: "The data processing system claimed in claim 15, wherein the media display exposure data includes reach data created by analyzing the collected respondent data to determine how many respondents were exposed to particular media displays." *Id*.

Claim 18 of the '280 Patent states: "The data processing system claimed in claim 17, wherein the reach data includes respondent demographic data." *Id*.

Claim 19 of the '280 Patent states: "The data processing system claimed in claim 17, wherein the media display exposure data includes frequency data created by analyzing the collected respondent data to determine the average number of media exposures per respondent." *Id*.

Claim 20 of the '280 Patent states; "The data processing system claimed in claim 19, wherein the reach and frequency data includes demographic data." *Id*.

Claim 21 of the '280 Patent states; "The data processing system claimed in claim 19, wherein the media display exposure data includes the ratings of media displays, the rating being based on the reach and frequency data." *Id*.

Claim 22 of the '280 Patent states; "The data processing system claimed in claim 21, wherein the reach and frequency data includes demographic information." *Id*.

Claim 23 of the '280 Patent states: "The data processing system claimed in claim 15, wherein the media display exposure data includes frequency data created by analyzing the

collected respondent data to determine the average number of media exposures per respondent."

*Id.*

Claim 24 of the '280 Patent states: "The data processing system claimed in claim 23, wherein the frequency data includes demographics." *Id.*

### E.     The '048 Patent

On June 11, 2013, the USPTO issued U.S. Patent Number 8,462,048 (the "'048 Patent"), entitled "Satellite Positioning System and Method for Determining the Demographics of Individuals Passing Retail Locations." *Id.* ¶ 25.[2]  The '048 Patent issued from U.S. patent application Serial Number 12/271,789 filed on November 14, 2008 and discloses and relates to assessing the effectiveness of media displays. *Id.* ¶ 26.

Claim 15 of the '048 Patent states:

A computer-implemented method of determining the demographics of and how often individuals ("respondents") pass predetermined geographic locations, the method comprising:

(a)  storing geo data in a plurality of respondent monitoring devices as said plurality of respondent monitoring devices move along respective paths of travel, each of said respondent monitoring devices associated with a respondent having known demographics, at least a portion of said geo data derived from a satellite positioning system (SPS), said stored geo data representing the movement of said plurality of respondent monitoring devices along said respective paths of travel; and

(b)  downloading said geo data stored in said plurality of respondent monitoring devices to a post processing server for analyzing the downloaded geo data to determine (i) the demographics of respondents passing a plurality of predetermined geographic locations and (ii) how often individual respondents pass each of the plurality of predetermined geographic locations by comparing the geo data representing the movement of said plurality of respondents monitoring devices along said respective paths of travel with stored data representing the plurality of predetermined geographic locations.

---

[2] The Complaint incorrectly identified the issuance date of the '048 Patent as July 11, 2003.  Dkt. No. 1 ¶ 25.

Dkt. No. 1, Ex. E at 39.

Claim 19 of the '048 Patent states: "The method of claim 15, wherein said geo data is grouped in accordance with the demographics of said respondents." *Id.*

Claim 28 of the '048 Patent states: "The method of claim 15, wherein said geo data includes velocity data describing the rate of movement of said plurality of monitoring devices." *Id.*

Claim 36 of the '048 Patent states: "The method claim 15 [sic] further comprising analyzing the collected path of travel satellite data to determine the number of respondents that pass each of the plurality of predetermined geographic locations." *Id.* at 40.

Claim 37 of the '048 Patent states: "The method of claim 36 further comprising categorizing the number of respondents that pass each of the plurality of predetermined locations according to the demographics of the respondents." *Id.*

Claim 38 of the '048 Patent states: "The method of claim 15 further comprising categorizing the number of respondents that pass each of the plurality of predetermined locations according to the demographics of the respondents." *Id.*

Individually and as a group, the Asserted Patents disclosed a system for using location tracking through satellite positioning to assess the effectiveness of media displays. By collecting data on respondents' paths of travel, downloading it to a server, and processing it, the system would allow the assessment of how many people passed a given media display, as well the determination of information about such people's demographics.

**Defendant's Products and Methods**

Defendant "makes, uses, sells, offers for sale, and/or imports into the United States" a product called the Geopath Insights Suite. Dkt. No. 1 ¶ 47. The Geopath Insights Suite is an audience location measurement platform that allows Geopath's customers to audit the audience

and circulation of out-of-home ("OOH") advertising.  *Id.*  OOH advertising is defined as
advertising that reaches consumers outside of their homes and includes digital and static
billboards.  *Id.* ¶ 44.  Digital billboards are electronic displays controlled by computers, by
means of which the image can be changed at different times.  *Id.* ¶ 45.

According to Geopath's marketing materials, the Geopath Insights Suites uses mobile
location data to "identify movement and activity patterns that help us understand how and why
people travel—their pathway, mode, volume, frequency, motivation and destination."  *Id.* ¶ 49.
In a May 8, 2018 blog post, Geopath wrote:

> The Geopath Insights Suite leverages aggregated, anonymous data from hundreds
> of millions of mobile devices, connected cars and GPS sources to enable targeting
> across thousands of audience segments, comparable with online measurement and
> surpassing traditional media channels.  The data can be seamlessly integrated into
> planning and buying programs to generate detailed insights on a national and hyper-
> local level and granular reporting by time, day of week and season.  The new
> software suite is map-based, user-friendly and can be utilized on a PC or mobile
> device.

Dkt. No. 1, Ex. G at 2.

III.

### The Alleged Infringement

RDPA alleges that Geopath's Insights Suite platform infringes all five of the Asserted
Patents.

With respect to the '131 Patent, RDPA alleges:

> On information and belief, the accused method of determining the effectiveness of
> media displays includes (a) storing geo data in a plurality of respondent monitoring
> devices as said plurality of respondent monitoring devices move along respective
> paths of travel, at least of portion of said geo data derived from a satellite
> positioning system, said stored geo data representing the movement of said plurality
> of respondent monitoring devices along said respective paths of travel; and (b)
> downloading said geo data stored in said plurality of respondent monitoring devices
> to a post processing server for: (i) matching the locations of a plurality of media
> displays to positions on said respective paths of travel of said plurality of
> respondent monitoring devices represented by said geo data; and (ii) rating the
> effectiveness of said plurality of media displays based on said matches between
> said plurality of media display locations and said positions on said respective paths

of travel of said plurality of respondent monitoring devices represented by said geo data.

Dkt. No. 1 ¶ 53.  These systems and methods are alleged to infringe claims 1, 3, and 7 of the

'131 Patent.  *Id*. ¶ 46.

> With respect to the '619 Patent, RDPA alleges:
>
> On information and belief, the accused method of assessing the effectiveness of media displays includes employing a plurality of monitoring devices for determining the paths of travel followed by a plurality of respondents, each of said respondents associated with a respective one of said plurality of monitoring devices each of said plurality of monitoring devices utilizing a satellite positioning system to independently track the movement of the related respondent along the path of travel followed by the respondent, each of said plurality of monitoring devices generating geo data that represents the path of travel followed by the respondent; storing said tracking as geo data; collecting the geo data from each of the monitoring devices; and analyzing said collected geo data to determine if said plurality of respondents have been exposed to media displays by matching said geo data that represents the paths of travel followed by said plurality of respondents with media display locations to determine the effectiveness of the media displays at the media display locations.

Dkt. No. 1 ¶ 63.  These systems and methods are alleged to infringe claims 1, 9, 13, 14, and 15

of the '619 Patent.  *Id*. ¶ 46.

> With respect to the '834 Patent, RDPA alleges:
>
> On information and belief, the accused method of determining the effectiveness of media displays includes employing a plurality of monitoring devices for tracking the paths of travel followed by a plurality of respondents, each of said respondents associated with a respective one of said plurality of monitoring devices, each of said plurality of monitoring devices utilizing a satellite positioning system to independently track the movement of the related respondent along the path of travel followed by the respondent, each of said plurality of monitoring devices generating satellite data that represents the path of travel followed by the respondent; storing said satellite data; collecting the satellite data from each of the monitoring devices; and analyzing said collected satellite data to determine if said plurality of respondents have been exposed to media displays by matching geo data based at least in part on said satellite data that represents the paths of travel followed by said plurality of respondents with media display locations to determine the effectiveness of the media displays at the media display locations.

Dkt. No. 1 ¶ 73.  These systems and methods are alleged to infringe claims 1, 8, and 12 of the

'834 Patent. *Id*. ¶ 46.

> With respect to the '280 Patent, RDPA alleges:

> On information and belief, the accused method of determining the effectiveness of media displays includes (a) tracking paths of travel followed by a plurality of respondents utilizing a satellite positioning system to: (i) independently track the movement of each of the respondents along the path of travel followed by the respondent; and (ii) generate satellite data that represents the path of travel followed by the respondent ("respondent satellite data"); (b) collecting the respondent satellite data; and (c) analyzing said collected respondent satellite data to determine if said respondents have been exposed to media displays by matching geo data based at least in part on said respondent satellite data with media display location data.

Dkt. No. 1 ¶ 83.

> RDPA further alleges:

> On information and belief, the accuses system for determining the effectiveness of media displays includes (a) a data processor; and (b) data storage coupled to the data processor, the data storage storing, in a form suitable for processing by the data processor, data representing the exposure of media displays to respondents ("media display exposure data"), said media display exposure data created by: (1) tracking paths of travel followed by a plurality of respondents utilizing a satellite positioning system to: (i) independently track the movement of each of the respondents along the path of travel followed by the respondent; and (ii) generate satellite data that represents the path of travel followed by the respondent ("respondent satellite data"); (2) collecting the respondent satellite data; and (3) analyzing said collected respondent satellite data to determine if said respondents have been exposed to media displays by matching geo data based at least in part on said respondent satellite data with media display location data.

*Id*. ¶ 84. These systems and methods are alleged to infringe claims 1 and 15-24 of the '280

Patent. *Id*. ¶ 46.

> With respect to the '048 Patent, RDPA alleges:

> On information and belief, the accused apparatus for determining the effectiveness of media displays includes a computer-implemented method of determining the demographics of and how often individuals ("respondents") pass predetermined geographic locations, the method comprising: (a) storing geo data in a plurality of respondent monitoring devices as said plurality of respondent monitoring devices move along respective paths of travel, each of said respondent monitoring devices associated with a respondent having known demographics, at least a portion of said geo data derived from a satellite positioning system, said stored geo data

representing the movement of said plurality of respondent monitoring devices along said respective paths of travel; and (b) downloading said geo data stored in said plurality of respondent monitoring devices to a post processing server for analyzing the downloaded geo data to determine (i) the demographics of respondents passing a plurality of predetermined geographic locations and (ii) how often individual respondents pass each of the plurality or predetermined geographic locations by comparing the geo data representing the movement of said plurality of respondents monitoring devices along said respective paths of travel with stored data representing the plurality of predetermined geographic locations.

Dkt. No. 1 ¶ 94.  These systems and methods are alleged to infringe claims 15, 19, 28, and 36-38 of the '048 Patent.  *Id*. ¶ 46.

**The Dispute**

IV.    On April 2006, RDPA sent a letter to Joseph C. Philport ("Philport"), the President of TAB (the former name of Geopath), indicating that TAB's development of a system for measuring exposure to outdoor media infringed the '131 Patent.  *Id*. ¶ 41.  In July 2009, Philport met with Roger Percy, managing member of RDPA and co-inventor of the Asserted Patents, and Cameron Percy, co-inventor of the Asserted Patents.  *Id*. ¶ 42.  They met again in August 2009, after Roger Percy delivered a packet with the Asserted Patents to the TAB office.  *Id*. ¶ 43.

RDPA filed its complaint in this case on May 7, 2020.  Dkt. No. 1.  The case was reassigned to the Court on May 28, 2020.  Geopath filed its motion to dismiss on October 27, 2020.  Dkt. No. 35.  RDPA filed its response in opposition on November 17, 2020, Dkt. No. 43, and Geopath replied on November 30, 2020, Dkt. No. 48.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011). However, although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (internal quotation marks and citation omitted).

The Federal Circuit has affirmed that subject matter eligibility under Section 101 of the Patent Act is a question of law suitable for resolution at the pleading stage of a patent case. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) ("Like other legal questions based on underlying facts, this question may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law."). The focus of a Section 101 inquiry is on the asserted claims. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012).

## DISCUSSION

Geopath raises two arguments in support of its motion to dismiss.  First, it argues that the claims of the Asserted Patents are not patentable under 35 U.S.C. § 101 because they are directed to an abstract idea.  Alternatively, it argues that, even if the subject matter were patentable, it has not infringed upon the Asserted Patents.

### Patentability of the Subject Matter

**I.**

Geopath argues, first, that the claims of the patent-in-suit are ineligible under 35 U.S.C. § 101, because they are directed to the abstract idea of evaluating the effectiveness of advertising media by exposure and lack any inventive concept.

Section 101 of the Patent Act defines the subject matter eligible for patent protection. Section 101 sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter."  35 U.S.C. § 101.  That capacious language carries with it certain limitations.  Because patent protection does not extend to claims that monopolize the "building blocks of human ingenuity," *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014), courts "have long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable," *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013); *see also id.* ("[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it.").  The prohibition on patenting "abstract ideas" reflects "the longstanding rule that '[a]n idea of itself is not patentable.'"  *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) (quoting *Rubber-Tip Pencil Co. v. Howard*, 87 U.S. 498, 507 (1874)).  The exception prevents patenting a result where "it matters not by what process or machinery the result is accomplished."  *O'Reilly v. Morse*, 56 U.S. 62, 113 (1854).

However, "an invention is not rendered ineligible for patent simply because it involves an

abstract concept." *Alice*, 573 U.S. at 217.  The Supreme Court has emphasized that courts must "tread carefully in construing [the] exclusionary provision lest it swallow all of patent law."  *Id*. Because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas' . . . an invention is not rendered ineligible for patent simply because it involves an abstract concept."  *Id*. (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*, 566 U.S. 66, 71 (2012)).  "'Applications' of such concepts 'to a new and useful end' . . . remain eligible for patent protection."  *Id*. (quoting *Gottschalk*, 409 U.S. at 67).

In *Alice*, the Supreme Court set forth a two-step test for determining whether an idea is unpatentable as a law of nature, natural phenomenon, or abstract idea (the "*Alice* test").  First, the court determines whether the claims at issue are directed to a patent-ineligible concept.  *Id.* at 216.  At step one of the *Alice* test, the focus of the inquiry is "the claimed advance over the prior art."  *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019).  A court must consider the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  Further, caution must be taken not to "simply ask whether the claims involve a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).  Courts "'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims."  *McRO, Inc. v. Bandia Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

"Where the patent involves computer software, *Alice* step one requires a court to 'articulate with specificity what the claims are directed to, and ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" *Gabara v. Facebook, Inc.*, 484 F. Supp. 3d 118, 124 (S.D.N.Y. 2020) (quoting *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017)).  The "mere automation of manual process using generic computers . . . does not constitute a patentable improvement in computer technology." *Trading Techs.*, 921 F.3d at 1384.  An asserted improvement in computer functionality must have "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018).

If the court determines that the claims at issue are directed to a patent-ineligible concept, the court should ask "[w]hat else is there in the claims before [it]?" *Prometheus Lab'ys.*, 566 U.S. at 78.  To answer that question, a court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'" *Alice*, 573 U.S. at 217 (quoting *Prometheus Lab'ys.*, 566 U.S. at 78).

Step two of the analysis is a search for an "inventive concept—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Id*. at 217-18 (quoting *Prometheus Lab'ys.*, 566 U.S. at 72-73).  "In looking for an inventive concept, a court must consider the elements of the claims 'both individually and as an ordered combination' to determine whether the additional elements have transformed the claim into a patent eligible application." *Gabara*, 484 F. Supp. 3d at 124 (quoting *BASCOM Glob. Internet Servs., Inc. v.*

*AT&T Mobility LLC*, 827 F.3d 1341, 1347 (Fed. Cir. 2016)).  "A claim contains an inventive

concept if it include[s] additional features that are more than well-understood, routine,

conventional activities."  *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1374

(Fed. Cir. 2017).  "If a claim's only 'inventive concept' is the application of an abstract idea

using conventional and well-understood techniques, the claim has not been transformed into a

patent-eligible application of an abstract idea."  *BSG Tech LLC*, 899 F.3d at 1290-91.  "A claim

that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more

than a drafting effort designed to monopolize the [abstract idea].'"  *Alice*, 573 U.S. at 221

(quoting *Prometheus Lab'ys.*, 566 U.S. at 77).  The "transformation [of an idea] into a

patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding

the words apply it.'"  *Id.* (quoting *Prometheus Lab'ys*, 566 U.S. at 72).

　　　Because the five Asserted Patents are substantially similar, one can serve for all five of

them.[3]  *See Pers. Beasties Grp. LLC v. Nike, Inc.*, 341 F. Supp. 3d 382, 386 (S.D.N.Y. 2018)

("Addressing each asserted claim in a § 101 analysis is unnecessary when the claims are

'substantially similar and linked to the same abstract idea.'") (quoting *Content Extraction &*

*Trans. LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2012)); *Gabara*, 484 F.

Supp. 3d at 126 ("The other claims in the Image Patents are substantially similar to Claim 1 of

the '400 Patent, with only semantic differences.  None of those differences are material to the

§ 101 analysis undertaken in either the first or second step.").

　　　**A.　　*Alice* Step One**

　　　Under step one of the *Alice* analysis, the Asserted Patents are directed to an abstract idea;

namely, the collection and analysis of data for the purpose of evaluating the effectiveness of

---

[3] Geopath argues this point in its brief and RDPA does not contest it.

OOH media.  Courts, including the Federal Circuit, have routinely held that the collection,

analysis, and presentation of data is an abstract idea for purposes of the *Alice* analysis.  *See, e.g.*,

*SAP*, 898 F.3d at 1163 ("The claims here are ineligible because their innovation is an innovation

in ineligible subject matter.  Their subject is nothing but a series of mathematical calculations

based on selected information and the presentation of the results of those calculations."); *Elec.*

*Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("The focus of the

asserted claims . . . is on collecting information, analyzing it, and displaying certain results of the

collection and analysis.  We need not define the outer limits of 'abstract idea,' or at this stage

exclude the possibility that any particular inventive means are to be found somewhere in the

claims, to conclude that these claims focus on an abstract idea—and hence require stage-two

analysis under § 101.").  Although the Asserted Patents claim a new solution to the problem of

collecting data on OOH media by relying on GPS technology, the Asserted Patents are

nonetheless directed to data collection and analysis—abstract ideas for purposes of the *Alice* test.

The fact that the Asserted Patents are limited to the narrow context of evaluating the

effectiveness of OOH media cannot save them from this conclusion.  Because "[i]nformation as

such is an intangible," courts "treat[] collecting information, including when limited to particular

content (which does not change its character as information), as within the realm of abstract

ideas."  *Elec. Power Grp.*, 830 F.3d at 1353.  However narrow the context of the data collection

the Asserted Patents are addressed to may be, the Asserted Patents remain directed towards the

collection of information.

RDPA points to several cases where, it argues, patent claims similar to those of the

Asserted Patents have been found eligible for protection at step one of the *Alice* test.  RDPA

cites, first, *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1229 (Fed. Cir. 2018).  The patents

in *Finjan* were directed towards a method for providing improved computer security against viruses. Though the Federal Circuit observed that "by itself, virus screening is well-known and constitutes an abstract idea," *id*. at 1304 (quoting *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1319 (Fed. Cir. 2016)), it held that "'non-abstract improvements to computer technology' [may] be deemed patent-eligible subject matter at [*Alice*] step one," *id*. (quoting *Enfish*, 822 F.3d at 1335-36). Because the method of the claims asserted "employ[ed] a new kind of file that enable[d] a computer security system to do things it could not before," the claims were "directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large." *Id*. at 1305.

RDPA also points to *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018). There, the asserted patents "disclosed improved display interfaces . . . for electronic devices with small screens like mobile telephones." *Id*. at 1359. The Federal Circuit held that "[t]he asserted claims . . . [were] directed to an improved user interface for computing devices, not to the abstract idea of an index, as argued by LG on appeal." *Id*. at 1362.

Neither *Finjan* nor *Core Wireless* is apposite to the facts of this case. In both cases, the Federal Circuit determined that the subject matter of the asserted patents was eligible for patent protection because it was directed to specific improvements in the functionality of a technology. Here, the asserted claims are not directed toward any improvement in an existing technology. Instead, they are directed towards a new application for data collected by GPS systems. The Asserted Patents do not disclose any improved method for location tracking or for the GPS systems themselves; instead, they propose applying the data collected by GPS and location tracking systems to a particular problem. Because the claims of the Asserted Patents are directed towards the analysis and collection of data, they accordingly are directed to an abstract idea

under step one of the *Alice* test, unlike the claims at issue in *Finjan* and *Core Wireless*.

RDPA additionally cites *TNS Media Research LLC v. Tivo Research & Analytics, Inc.*, 223 F. Supp. 3d 168 (S.D.N.Y. 2016). In *TNS*, the asserted patents, like the Asserted Patents here, were directed towards the measurement of the effectiveness of advertising:

> In particular, . . . the invention [was] a method of gathering, storing, and analyzing data relating to media consumption (such as television programming) where a viewer would be exposed to advertising, and combining that with that same viewer's product-purchasing data (such data might, for instance, be extracted from a loyalty card or credit card), as well as demographic data (for example, census data). After voluminous data is gathered, it is stored, processed, and used to calculate a return on investment or other target metric for advertising. In sum, the method described in the invention would enable an advertiser to know whether showing a commercial regarding product "x" correlated with a subsequent purchase of product "x" by some, all, or any of the viewers of a particular commercial shown in a particular medium at a particular time.

*Id*. at 172. The court acknowledged the Federal Circuit's case law holding that the use of a computer to perform well-known business practices was not patentable, and that the collection and analysis of data are directed to an abstract concept for purposes of the Section 101 analysis. *Id*. at 178. However, it held that the asserted patents were not directed to an abstract concept because they were directed to "multi-sourced, granular collection of data that allows for real-time calculations of utility." *Id*. at 182.

While the holding of *TNS* suggests that the claims of the Asserted Patents here should be found eligible for protection at *Alice* step one, subsequent case law—both from courts in this District and from the Federal Circuit—shows that such a broad reading of *TNS* is not good law. In *iSentium, LLC v. Bloomberg Finance L.P.*, 343 F. Supp. 3d 379 (S.D.N.Y. 2018), a plaintiff sought to enforce a patent for a system for evaluating public sentiment through analysis of messages posted on social media platforms. At step one of the *Alice* test, the court determined that the claims were directed to "the abstract idea of collecting statements from social media and

22

identifying opinions through the use of algorithms and databases." *Id*. at 388.  Relying on law from the Federal Circuit, the court concluded that "data analysis is an abstract idea excluded by section 101, even if done with an efficiency and scale not achievable by individuals." *Id*. at 389 (citing *SAP*, 898 F.3d at 1163-65); *see also SAP*, 898 F.3d at 1167 ("[C]laims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea.") (quoting *Elec. Power Grp.*, 830 F.3d at 1353); *OIP Tech., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-64 (Fed. Cir. 2015) (use of a computerized system to gather data and automatically determine optimal sale price for merchandise in e-commerce is an abstract idea ineligible for patent protection).  *iSentium* and the Federal Circuit decisions upon which it relied indicate that *TNS* is an outlier, and that courts will generally not find methods for data collection and analysis to be patentable, even if such methods would not be possible without the use of computer technology.

Because data collection and analysis are abstract ideas for the purposes of Section 101, the claims of the Asserted Patents are ineligible at *Alice* step one.

### B.    *Alice* Step Two

Under step two of the *Alice* test, the court must "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221.  To be eligible at *Alice* step two, a patent must reflect "an inventive concept in the non-abstract application realm." *SAP*, 898 F.3d at 1168.  "Appending purely conventional steps to an abstract idea does not supply a sufficiently inventive concept." *In re Smith*, 815 F.3d 816, 819 (Fed. Cir. 2016).  "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim's scope." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (internal

quotation marks omitted).

The patents-in-suit in this case do not satisfy step two of the *Alice* test.  The patents do not describe any new techniques for storing, generating, downloading, or analyzing data.  Nor do they describe any new technologies or improvements to existing technologies.  What they propose, instead, is the application of existing technologies for gathering data to a new problem; namely, the problem of ascertaining information about the number of individuals who are exposed to OOH media as well as information about such individuals' demographics.  The mere use of existing GPS technology to implement a strategy for identifying individuals near a location and the analysis of such data are not sufficient to add an inventive concept to the abstract idea at the core of the Asserted Patents.  Determining location by a positioning system and downloading and comparing data by a computer are routine functions of GPS components carrying out their basic purpose.  *See Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d at 1331 ("[R]eceiving transmitted data over a network . . . merely implicates purely conventional activities that are the 'most basic functions of a computer.'") (quoting *Alice*, 573 U.S. at 225); *SAP*, 898 F.3d at 1170 ("[A]n invocation of already-available computers that are not themselves plausibly asserted to be an advance for use in carrying out improved mathematical calculations, amounts to a recitation of what is well-understood, routine, and conventional."); *Elec. Power Grp.*, 830 F.3d at 1355 ("[I]nvocations of computers and networks that are not even arguably inventive are insufficient to pass the test of an inventive concept in the application of an abstract idea.").

This conclusion follows from a line of Federal Circuit cases holding that the application of existing data collection processes to a novel or specific problem is not patentable.  In *Electric Power Group*, the Federal Circuit evaluated the patentability under Section 101 of certain patents

which "describe[d] and claim[ed] systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the result." *Id.* at 1351. The court held that the patents were directed to an abstract idea, because "[t]he advance they purport to make is a process of gathering information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions." *Id.* at 1354. At step two of the *Alice* analysis, the court determined that the patents contained "nothing sufficient to remove the claims from the class of subject matter ineligible for patenting." *Id.* Importantly for the claims here, the court held that "limiting the claims to the particular technological environment of power-grid monitoring is, without more, insufficient to transform [the patent claims] into patent-eligible applications of the abstract idea at their core." *Id.* According to the court, "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information based-category of abstract ideas." *Id.* at 1355.

The court reached a similar conclusion in *OIP Technologies*. There, the plaintiff held a patent that claimed a computer-implemented system for optimizing prices that it claimed the defendant had infringed. 788 F.3d at 1360. The court found that the claims were directed to the abstract concept of "offer-based price optimization." *Id.* at 1362. Beyond the abstract idea, the patent claims only "recite[d] well-understood, routine conventional activities, either by requiring conventional computer activities or routine data-gathering steps." *Id.* at 1363 (internal citation and quotation marks omitted). Because the concept behind the patent was nothing more than an automated, computer-implemented version of an existing industry practice, it was not patentable.

Finally, in *Credit Acceptance*, the Federal Circuit evaluated the eligibility of a patent that

included system and method claims directed to "provid[ing] financing for allowing a customer to purchase a product selected from an inventory of products maintained by a dealer."  859 F.3d at 1047.  The claims of the patent protected "a system for maintaining a database of information about the items in a dealer's inventory, obtaining financial information about a customer from a user, combining these two sources of information to create a financing package for each of the inventoried items, and presenting the financing packages to the user."  *Id*. at 1054.  The court held that this process was abstract, and contained no innovative concept, because it simply automated the previously manual processing of loan applications.  *Id*.  Where the "focus of the claims is not on . . . an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools."  *Id*. (quoting *Elec. Power Grp.*, 830 F.3d at 1354).

Following these cases, Plaintiff's claims fail step two of the *Alice* test.  The Asserted Patents do not purport to protect any new improvements to the technology of data collection, such as the GPS's or location trackers used to produce the relevant data.  Nor do they purport to protect an improvement in computer technology that might aid in the transmission, downloading or storage of such information.  Like the claims in *Electric Power Group, OIP Technologies*, and *Credit Acceptance*, the Asserted Patents claim no more than the application of a generally understood technology to a specific type of data, along with the analysis and presentation of such data.  Without more, there is no inventive concept sufficient to satisfy step two of the *Alice* test.  And, just as the Federal Circuit held in *Electric Power Group*, the fact that the data to be collected and analyzed is germane to a specific, narrowly defined problem cannot save the eligibility of the claims.

RDPA attempts to argue that the Asserted Patents contain a sufficiently inventive concept.  In support of its position, RDPA relies upon a different line of cases which have held

that an "inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350; *see also Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("[A] new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made."); *Personalized Media Commc'ns, LLC v. Netflix Inc.*, 475 F. Supp. 3d 289, 303 (S.D.N.Y. 2020) ("[S]imply because one part of a patent relies on conventional hardware does not mean that the entire patent lacks an inventive concept."). RDPA argues that the "ordered combination of the claim limitations" in the Asserted Patents "create an inventive concept." Dkt. No. 43 at 19.

The facts here do not fall within the holdings of the cases cited by RDPA. All three cases concerned patents that were directed to improvements to technological processes and not to data collection or analysis. In *BASCOM*, the patents were directed toward an improved method for protection against computer viruses. Though the Federal Circuit found that "virus protection" was an abstract idea, the court held that the "installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user," was a sufficiently innovative concept to render the idea patentable. *BASCOM*, 827 F.3d at 1350; *see also Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) ("[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act.").

The patents at issue in *BASCOM* are different from the Asserted Patents insofar as they represented an improvement upon an existing technology, rather than a new use case for existing data. Unlike *BASCOM*, the Asserted Patents here rely upon the use of generic computing

components in a conventional way to claim an abstract idea. *BASCOM* distinguished *OIP Technologies* and *Content Extraction*—cases whose facts more closely resemble those of the case here as discussed above—on this ground. *See BASCOM*, 827 F.3d at 1351 ("[T]he claims [in *OIP*] simply required the performance of the abstract idea of offer-based price optimizing on generic computer components using conventional computer activities. The intrinsic record in *OIP* confirmed that the invention was simply the generic automation of traditional price-optimization techniques."); *id* at 1351 (observing that the claims in *Content Extraction* "claim[ed] an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way" and that they "preempted all use of [a] claimed abstract idea on well-known generic scanning devices and data processing technology").

Diehr and *Netflix* are still further afield. *Diehr* concerned a patent for a process for molding raw, uncured synthetic rubber into cured precision products, 450 U.S. at 177, while *Netflix* concerned a system for remote reprogramming of receiver station software that allowed for a wider variety of programming options on the same equipment, 475 F. Supp. 3d at 301. They bear little resemblance to the facts of the case here, which concern patents addressed to the routine processes of data gathering, processing, and analysis.

RDPA argues alternatively that the Asserted Patents embody an inventive concept because they are "tied to a particular machine or apparatus" and because they "transform[] a particular article into a different state or thing." Dkt. No. 43 (quoting *Bilski v. Kappos*, 561 U.S. 593, 602 (2010)). In the first place, this argument is foreclosed by precedent holding that the automation of previously existing processes is not patentable. *See Bilski*, 561 U.S. at 610-11 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to

limit the use of [the idea] to a particular technological environment."). Second, RDPA relies

upon *SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319 (Fed. Cir. 2010)

for the proposition that the use of a GPS receiver can place a meaningful limit on the scope of a

patent's claims. But *SiRF* is not relevant to this case. *SiRF* concerned patents directed to

particular improvements in Assisted-GPS technology that could improve GPS accuracy in

certain environments where signal reception was poor. *Id*. at 1323. While the court noted that

"the presence of the GPS received in the claims places a meaningful limit on the scope of the

claims," it went on to observe that "[w]e are not dealing with a situation in which there is a

method that can be performed without a machine." *Id*. at 1332-33.[4] Thus, *SiRF* did not hold that

the mere fact that GPS-systems were involved in a patent would, on its own, render otherwise

unpatentable subject matter patentable. Such a holding would be at odds with a long line of

Federal Circuit cases holding that "analyzing information by steps people go through in their

minds, or by mathematical algorithms, without more, [is an] essentially mental process[] within

the abstract-idea category." *Elec. Power Grp.*, 830 F.3d at 1354. Counting individuals who are

exposed to OOH media by hand, while less efficient than the method disclosed in the Asserted

Patents, is fundamentally the same activity that the patents protect. A claim, like the one here,

that involved only the use of data collected by a GPS system with no improvements to GPS

technology itself is not patentable on its own.

Finally, RDPA argues that the Court should refrain from performing step two of the *Alice*

analysis at this time, in order to wait for further factual development of the question whether the

Asserted Patents include an inventive concept. RDPA refers to case law for the proposition that

---

[4] *SiRF* predates the Supreme Court's decision in *Alice* and applied a different test for
patentability under Section 101.

a court should not grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) where there is a factual dispute "regarding whether the invention describes well-understood, routine, and conventional activities." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) ("Whether the claim elements or the claimed combination are well-understood, routine, conventional [sic] is a question of fact.  And in this case, that question cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice.").

While there may be cases where factual development is needed in order to determine patent eligibility, this is not one of them.  No matter how innovative the concept behind the Asserted Patents may have been—indeed, the concept may have been very innovative at the time the applications for the patents were filed—it is addressed solely to an abstract idea under the *Alice* test.  And in the absence of an innovative concept that goes beyond the abstract idea, no further factual development is needed in order for the Court to determine that dismissal is appropriate.

II.

**Direct Infringement**

Geopath argues, in the alternative, that RDPA's complaint should be dismissed for failure to allege infringement of the Asserted Patents.  Because the Court dismisses the case based on the eligibility of the Asserted Patents under Section 101, the Court does not reach the issue of direct infringement.

## CONCLUSION

For the foregoing reasons, Geopath's motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to close Dkt. No. 35, as well as Dkt. Nos. 49 and 50, and to close the case.

SO ORDERED.

Dated: June 15, 2021
        New York, New York                            _____
                                                                LEWIS J. LIMAN
                                                          United States District Judge

31